# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KELLY M. AWAD,              )
                                 )
       Plaintiff,           )
                                 )
       vs.               )        Case No. 4:05CV407 DJS (LMB)
                                 )
JO ANNE B. BARNHART,       )
Commissioner of Social Security,     )
                                 )
       Defendant.      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Kelly Awad's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 14).

## Procedural History

On October 10, 2002, plaintiff filed her application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on March 20, 2002. (Tr. 61-63). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated November 19, 2004. (Tr. 16, 9-15). Plaintiff then filed a request for review of the ALJ's decision with the

Appeals Council of the Social Security Administration (SSA), which was denied on January 27,

2005. (Tr. 5, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner.

See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## **Evidence Before the ALJ**

### A. **ALJ Hearing**

Plaintiff's administrative hearing was completed on August 10, 2004.[1] (Tr. 286). Plaintiff

was present and was represented by counsel. (Id.). The ALJ noted that a vocational expert, Dr.

Jeffrey Magrowski, was present and planned to testify. (Id.). The ALJ stated that additional

medical evidence was submitted the morning of the hearing, and that he had reviewed this

evidence prior to the hearing. (Id.). The ALJ next admitted the exhibits into the record. (Id.).

Plaintiff's attorney then claimed that the ALJ did not comply with regulations concerning

the appointment of vocational experts. (Tr. 287). The ALJ questioned plaintiff's attorney

regarding the alleged procedural violation. (Id.). Plaintiff's attorney then announced that he was

withdrawing his objection to the alleged error in order to avoid further delay for his client. (Tr.

288).

Plaintiff's attorney then examined plaintiff, who testified that she is separated from her

husband and lives in Florissant, Missouri with her nine-year-old daughter Jessica. (Tr. 288-89).

Plaintiff stated that she was born on February 15, 1964, and has a college education. (Tr. 289).

Plaintiff testified that she was employed with AT&T until March 2002, and that she earned

$28,000 to $30,000 at that position. (Id.). Plaintiff stated that she was diagnosed with

---

[1]A hearing was begun on December 29, 2003, but was continued because plaintiff's
attorney objected to the presence of a vocational expert. (Tr. 352-54).

fibromyalgia[2] at the age of 22.  (Tr. 290).  Plaintiff testified that Dr. Faquir Mohammed diagnosed her with plantar fasciitis[3] in 2001.  (Id.).  Plaintiff stated that she injured her leg, lower back, and right hip when she fell on ice.  (Tr. 292).  Plaintiff testified that these injuries caused her fibromyalgia and rheumatoid arthritis,[4] and prevented her from functioning at work.  (Id.).

Plaintiff stated that she missed a significant amount of work due to her medical impairments and that her employer disapproved of her absences even though she presented her employer with documentation from her doctors.  (Id.).  Plaintiff testified that her employer eventually terminated her employment and her medical insurance as a result of her absences.  (Tr. 293).  Plaintiff stated that she continued to receive treatment for her various conditions and that Medicaid paid for her treatment.  (Id.).

Plaintiff testified that Dr. Steven Baak, her rheumatologist, prescribed Celexa[5] and BuSpar,[6] which helped her tremendously.  (Id.).  Plaintiff explained that she suffered from significant anxiety and depression due to her medical problems and being terminated.  (Id.).  Plaintiff stated that Dr. Baak also provided pain management treatment.  (Tr. 293-94).  Plaintiff

---

[2]A syndrome of chronic pain of musculoskeletal origin but uncertain cause.  The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body both above and below the waist, as well as in an axial distribution; additionally there must be point tenderness in at least 11 of 18 specified sites.  Stedman's Medical Dictionary, 671 (27th Ed. 2000).

[3]Inflammation of the sole of the foot causing foot or heel pain.  See Stedman's at 652.

[4]An inflammatory disease that primarily affects connective tissue, and is characterized by joint swelling, tenderness, and pain.  See Stedman's at 149.

[5]Celexa is indicated for the treatment of depression.  See Physicians' Desk Reference (PDR), 1270 (59th Ed. 2005).

[6]BuSpar is indicated for the treatment of anxiety.  See PDR at 2578.

testified that Dr. Baak tried multiple medications for her fibromyalgia, including Flexeril,[7] which allows her to "somewhat function." (Tr. 294). Plaintiff stated that in January of 2002, when she was under the care of Dr. Baak, she only left the house to attend doctor appointments. (Tr. 294-95).

Plaintiff testified that she also received care from Dr. Shari Kaminski, a podiatrist, who diagnosed her with plantar fasciitis and tarsal tunnel[8] in the right leg. (Tr. 295). Plaintiff stated that she underwent ten sessions of physical therapy, and used night splints and orthotic inserts in her shoes. (Id.). Plaintiff testified that when these treatments were ineffective, Dr. Kaminski determined that surgery was necessary. (Id.). Plaintiff stated that the surgery required a twelve-week recovery period, and that AT&T terminated her the day after she underwent surgery. (Id.). Plaintiff testified that the surgery improved her foot condition, although she still suffers from pain in the lower back and right hip. (Id.).

Plaintiff stated that she received psychiatric treatment from Dr. Ibe O. Ibe. (Tr. 295-96). Plaintiff testified that she did not know her diagnosis because Dr. Ibe thought that discussing the details of her condition would not be beneficial for her. (Tr. 296). Plaintiff stated that she was prescribed psychiatric medications, which she continues to take, and that these medications help her. (Id.). Plaintiff explained that she has a fear of leaving her home and being in crowds, although she can tolerate being around a small number of people. (Id.). Plaintiff stated that she

---

[7]Flexeril is indicated for the relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1931.

[8]Compression of the nerves in the instep of the foot, which causes pain, burning, and tingling on the sole of the foot. See Stedman's at 1787, 1897.

has no recollection of her psychiatrist mentioning the condition agoraphobia[9] to her, although he did discuss depression and anxiety. (Tr. 296-97).

Plaintiff testified that she underwent examinations at St. John's Mercy Hospital. (Tr. 297). Plaintiff stated that she recently received a cortisone injection and that this provided significant pain relief for the middle of her back, although it did not relieve the pain in her shoulders, right hip, or lower back. (Id.). Plaintiff explained that she is receiving the cortisone shots for herniated discs. (Id.). Plaintiff stated that her doctors have discussed the possibility of surgery but they want to try cortisone injections first. (Id.). Plaintiff testified that she experiences extreme pain in her back. (Id.). Plaintiff stated that she initially took Vicodin,[10] which did not provide relief, so her doctor prescribed Morphine.[11] (Id.). Plaintiff testified that when the Morphine did not provide relief, her doctor prescribed Oxycontin,[12] which she currently takes twice daily. (Id.).

Plaintiff's attorney next questioned plaintiff about her daily activities. (Tr. 298). Plaintiff testified that she attended court in Jerseyville, Illinois, the day before the hearing, and after sitting

---

[9]A mental disorder characterized by an irrational fear of leaving the familiar setting of home, or entering into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided. Stedman's at 37.

[10]Vicodin is an opioid analgesic indicated for the relief of moderate to moderately severe pain. See PDR at 526.

[11]Morphine is a pure opioid agonist indicated for the relief of moderate to severe pain "requiring continuous, around-the-clock opioid therapy for an extended period of time." PDR at 1816.

[12]OxyContin is an opioid analgesic that is "a controlled-release oral formulation of oxycodone hydrochloride indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time." PDR at 2818-19.

for a half hour, she had to go home and sleep for five hours. (Id.). Plaintiff stated that her friend drove her to Jerseyville. (Id.). Plaintiff testified that she drives occasionally, although she does not drive long distances. (Id.). Plaintiff stated that she limits the amount of housework she does and that her daughter helps her with the housework. (Id.). Plaintiff testified that she is learning how to do chores like yard work in different ways, taking into account her impairments. (Id.). Plaintiff stated that she is unable to do housework for six hours straight without lying down and resting. (Id.).

Plaintiff testified that she experiences difficulty walking a half block to her friend's house. (Tr. 298-99). Plaintiff testified that after walking a half block, she is winded and exhausted, and must lie down. (Tr. 299). Plaintiff stated that she also experiences difficulty holding items in her hand because she has "trigger thumb."[13] (Id.). Plaintiff testified that she has carpal tunnel syndrome[14] in her right arm and that she had surgery on that arm. (Id.). Plaintiff stated that she will undergo surgery on her left arm for carpal tunnel syndrome sometime in the future. (Tr. 299-300). Plaintiff rated her pain as a seven on a scale of one to ten on an average day. (Tr. 300). Plaintiff testified that her pain remains at a level of seven despite taking the Oxycontin. (Id.). Plaintiff stated that none of the doctors that she has seen has suggested that she was able to return to work. (Id.).

The ALJ next examined plaintiff, who testified that she began taking the Oxycontin two months prior to the hearing and that Dr. Eric Mai prescribed it. (Id.). Plaintiff stated that she

_____

[13]Trigger thumb is a condition in which the movement of the thumb is arrested for a moment in flexion or extension and then continues with a jerk. See Stedman's at 676.

[14]Nerve entrapment characterized by nocturnal hand paresthesia and pain and sometimes sensory loss and wasting in the median hand distribution. See Stedman's at 1749.

began seeing Dr. Mai approximately one year prior to the hearing.  (Id.).  Plaintiff explained that she is no longer taking Vicodin.  (Tr. 301).  Plaintiff testified that her medications include Celexa, BuSpar, Flexeril, OxyContin, Combivent,[15] Imodium,[16] and Pepcid AC.[17]  (Id.).  Plaintiff stated that Dr. Mai prescribed the Celexa.  (Id.).  Plaintiff testified that she last saw a psychiatrist, Dr. Ibe, six months prior to the hearing.  (Tr. 302).  Plaintiff stated that Dr. Mai ordered an MRI[18] the winter prior to the hearing because she had been experiencing extreme pain since 2001, due to her lower back injury.  (Id.).

Plaintiff testified that she is able to lift and carry 25 to 30 pounds.  (Id.).  Plaintiff stated that she can stand and sit for about 20 minutes.  (Tr. 303).  Plaintiff testified that she smokes about a pack of cigarettes a day.  (Id.).  Plaintiff stated that her doctors have advised her to quit smoking.  (Id.).  Plaintiff testified that a year prior to the hearing she tried taking a prescription medication to assist in her effort to quit.  (Id.).  Plaintiff testified that she is a recovering alcoholic and that the last time she consumed alcohol was in 1990.  (Id.).  Plaintiff stated that she has not used any street drugs of any type since March 20, 2002.  (Tr. 304).  Plaintiff testified that she does not take any non-prescription medication of any type.  (Id.).  Plaintiff stated that she experiences side effects, including dizziness and dry mouth, from her medications.  (Id.).

---

[15]Combivent Inhalation Aerosol is indicated for use in patients with chronic obstructive pulmonary disease on a regular aerosol bronchodilator who continue to have evidence of bronchospasm and who require a second bronchodilator.  See PDR at 992.

[16]Imodium is indicated for control and symptomatic relief of acute nonspecific diarrhea and of chronic diarrhea associated with inflammatory bowel disease.  See PDR at 1932.

[17]Pepcid AC is indicated for the relief of heartburn associated with acid indigestion.  See PDR at 1766.

[18]Abbreviation for Magnetic Resonance Imaging.  Stedman's at 1135.

Plaintiff testified that she received a two-year degree in business management and paralegal studies in 1993, and that she has almost completed a two-year degree in paralegal studies. (Tr. 304-05). Plaintiff stated that the last time she completed any work towards her paralegal degree was four years prior to the hearing. (Tr. 305).

Plaintiff testified that she was terminated on March 12, 2002, and that the last day she actually worked was in December of 2001. (Id.). The ALJ expressed confusion over the fact that plaintiff earned $27,228.00 in 2002, when plaintiff testified that she was terminated in March of that year. (Tr. 306). Plaintiff testified that she did not remember why her earnings were so high for that three-month period. (Id.). Plaintiff stated that she was not working and was receiving disability pay, which amounted to half of her regular pay, for the one-year period prior to her termination. (Tr. 307). Plaintiff testified that she applied for Workers' Compensation for a leg injury and carpal tunnel syndrome after she was terminated, and that a hearing was held regarding this claim on October 21, 2001. (Id.). Plaintiff stated that she did not receive any temporary Workers' Compensation benefits. (Id.).

Plaintiff testified that she has a current driver's license but she has expired license plates, and that she rarely drives. (Id.). Plaintiff stated that in the week prior to the hearing she drove to the grocery store three times. (Tr. 308). Plaintiff testified that she went to court in Illinois the day prior to the hearing for a ticket. (Id.). Plaintiff stated that she received the ticket about two months prior to the hearing and that the ticket resulted from having a male passenger in her vehicle with an open container of alcohol. (Tr. 309). The ALJ commented that traveling to Illinois with a man who was drinking in her car appeared inconsistent with her testimony that she rarely drives and is confined to her home due to pain. (Id.). Plaintiff testified that she drove to

the River Road in Illinois with this man to calm herself.  (Id.).  Plaintiff explained that the man is

an alcoholic and his parents wanted her to get him out of the house for a while.  (Tr. 309-10).

Plaintiff testified that she attends Alcoholics Anonymous meetings when she is not feeling well

and that the last time she attended a meeting was approximately six months prior to the hearing.

(Tr. 310).

Plaintiff testified that she and her daughter prepare meals that they can cook in the

microwave.  (Id.).  Plaintiff stated that she receives Medicaid benefits and food stamps.  (Id.).

Plaintiff testified that her daughter is disabled and receives Supplemental Security Income.

(Tr. 310-11).  Plaintiff stated that she and her daughter shop for groceries about once a month

when she receives her food stamps.  (Tr. 311).

Plaintiff testified that she spends a typical day watching television, helping her daughter

with her studies, and playing with her rabbits.  (Id.).  Plaintiff stated that she spends about six

hours a day watching television.  (Id.).  Plaintiff testified that she also enjoys reading detective

stories and that she usually reads for an hour or two.  (Tr. 311-12).  Plaintiff stated that she

spends about an hour a week playing solitaire.  (Tr. 312).  Plaintiff testified that she does not

belong to a church or any social organizations.  (Id.).  Plaintiff stated that she does laundry when

she feels well enough.  (Id.).  Plaintiff testified that she does about a load of laundry every other

day.  (Id.).  Plaintiff stated that she also cuts her grass, but she can only cut about a quarter of the

lawn at a time.  (Id.).  Plaintiff testified that it takes her about an hour to cut a quarter of the lawn.

(Tr. 313).

Plaintiff testified that she experiences pain in her back at a level of seven on a scale of one

to ten.  (Id.).  Plaintiff stated that being overly tired, over-exerting herself, and trying to pick up

heavy things increase her pain. (<u>Id.</u>). Plaintiff testified that hot showers and massages provide some relief for her pain, bringing her pain level down to a six out of ten. (<u>Id.</u>). Plaintiff stated that she has gone to the emergency room because of pain, and that the last time she did this was approximately six months prior to the hearing, when she went to Christian Northwest Hospital. (<u>Id.</u>).

Plaintiff testified that she also experiences constant pain in her right hip, which she rated as a six or seven. (Tr. 312-13). Plaintiff stated that walking, sitting in the same position for prolonged periods, and driving increase her hip pain. (Tr. 314). Plaintiff testified that stretching, changing positions and swimming provide some relief for her hip pain. (<u>Id.</u>). Plaintiff stated that she very rarely swims. (<u>Id.</u>). Plaintiff testified that she went swimming in the month prior to the hearing at a hotel in Farmington. (<u>Id.</u>). Plaintiff explained that she and her sister took their grandchildren to Farmington for the night, and that her sister drove. (<u>Id.</u>).

Plaintiff testified that her fibromyalgia causes pain in her shoulders and arms, and her carpal tunnel syndrome also causes pain in her arms. (Tr. 315). Plaintiff rated her shoulder pain as a seven. (<u>Id.</u>). Plaintiff stated that this pain increases when she experiences anxiety or stress. (<u>Id.</u>). Plaintiff testified that hot showers provide significant relief, bringing her pain down to a five or six. (<u>Id.</u>). Plaintiff stated that she has carpal tunnel syndrome in both of her arms and that she experiences more pain in her left arm because she underwent carpal tunnel surgery in her right arm. (<u>Id.</u>). Plaintiff testified that Dr. Charles D. Ettelson performed the surgery on her right arm at St. Luke's Hospital a year prior to the hearing. (Tr. 316-17). Plaintiff stated that she had an appointment scheduled with a new doctor to discuss surgery on her left arm. (Tr. 317).

Plaintiff testified that she experiences pain at a level of seven in her right arm daily. (Tr.

318).  Plaintiff stated that anxiety, depression, and over-exertion increase her pain, and that rest, hot showers, and swimming decrease the pain to a level of five or six.  (Id.).  Plaintiff testified that she experiences constant pain in her left arm at a level of seven.  (Tr. 319).  Plaintiff stated that anxiety and depression increase the pain and heat and hot water decrease the pain to a level of five or six.  (Tr. 320).

Plaintiff testified that she has triggerthumb in her right hand, which causes significant pain.  (Id.). Plaintiff explained that she has experienced triggerthumb in her right hand since she underwent the carpal tunnel release surgery on October 31, 2003.  (Id.).  Plaintiff rated the pain caused by the triggerthumb as a nine when it is inflamed, which is about eight hours every day.  (Tr. 321).  Plaintiff testified that overusing her right hand increases her pain and massaging her hand decreases the pain to a "tolerable" level of five or six.  (Id.).  Plaintiff stated that she experiences pain and numbness in her left wrist or hand about eight hours every day, which she rates as a seven.  (Tr. 321-22).  Plaintiff testified that overusing her left hand increases her pain and doing exercises and taking hot showers decreases her pain to a level of six or seven.  (Tr. 322).

Plaintiff testified that in January of 2002 she remained in bed all day except to attend doctor appointments.  (Id.).  Plaintiff stated that she experiences difficulty with crowds of people.  (Id.).  Plaintiff explained that she can be around four to five people, although it depends on who the people are.  (Id.).  Plaintiff testified that she discontinued psychiatric treatment because Dr. Ibe stopped taking Medicaid.  (Tr. 323).  Plaintiff stated that she has not sought treatment from any other source because she believes that all a psychiatrist can do for her is prescribe Celexa and BuSpar.  (Id.).

Plaintiff testified that she also has hepatitis C[19] and degenerative bone disorder.[20] (Id.). Plaintiff stated that she is not receiving treatment for the hepatitis C but that her doctors are monitoring her enzymes. (Id.). Plaintiff testified that the last time she received a test was approximately a year before the hearing. (Id.). Plaintiff stated that the degenerative bone disorder produces a feeling that her "bones are not connected in a lot of ways." (Id.). Plaintiff explained that this feeling occurs primarily in her hips and upper thighs. (Tr. 324).

Plaintiff further testified that she has had asthma for five years and that Dr. Mohammed is treating her for the asthma. (Id.). Plaintiff stated that Dr. Mohammed prescribed Combivent and that she uses an inhaler. (Id.). Plaintiff testified that she has not gone to the emergency room because of her asthma but that her asthma causes shortness of breath, coughing, and vomiting. (Id.). Plaintiff stated that the last time she experienced these symptoms was the day prior to the hearing, and that she used her inhaler and took a hot shower to relieve the symptoms. (Id.). Plaintiff testified that she also experiences "bladder problems" when she has coughing spells, which causes her to urinate. (Tr. 324-25).

---

[19]Hepatitis is the inflammation of the liver, due usually to viral infection but sometimes to toxic agents. Hepatitis C is the principal form of transfusion-induced hepatitis; a chronic active form often develops. Acute infection with hepatitis B or C has a higher mortality rate than hepatitis A. Interferon-alpha brings about clinical remission in some cases of heaptitis B and hepatitis C. See Stedman's at 808.

[20]"Degenerative joint disease" is also known as "osteoarthritis," which is "[a]rthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints, is more common in older persons." Stedman's at 513, 1282.

Plaintiff testified that she also suffers from irritable bowel syndrome[21] and that she takes Imodium and Pepcid AC for this condition. (Tr. 325). Plaintiff stated that the Pepcid AC does not completely resolve her symptoms and that she still has to be careful of what she eats. (Tr. 326). Plaintiff testified that Dr. Mai is treating her for the irritable bowel syndrome. (Id.). Plaintiff stated that she also suffers from acid reflux[22] and that she has had the irritable bowel syndrome and acid reflux for about two years. (Id.). Plaintiff testified that she takes Pepcid AC for the acid reflux, which provides relief. (Id.).

Plaintiff's attorney and the ALJ then resumed the discussion regarding plaintiff's last day of employment and the income she received in 2002. (Tr. 327). Plaintiff's attorney indicated that plaintiff was receiving long-term disability through AT&T, which explained her earnings in 2002. (Tr. 328). Plaintiff's attorney attempted to testify regarding AT&T's long-term disability program due to his personal experience with the program. (Id.). The ALJ stated that it was inappropriate to hear testimony from plaintiff's attorney about his own personal experience. (Tr. 329). The ALJ continued to express confusion regarding plaintiff's last day of employment. (Tr. 329-31). Plaintiff and her attorney indicated that letters from AT&T were in the file, and that these letters should contain the requested information. (Id.). Plaintiff testified that the last day she physically worked for AT&T was in December of 2001, but she was on disability for almost a year after that, until September 27, 2002. (Tr. 332).

---

[21]Disorder characterized by a group of symptoms in which abdominal pain or discomfort is associated with a change in bowel patterns, such as loose or more frequent bowel movements, diarrhea, or constipation. See Stedman's at 230.

[22]Acid reflux disease, or gastroesophageal reflux disease (GERD), is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 514.

A lengthy discussion ensued thereafter, in which plaintiff's attorney accused the ALJ of impugning his integrity by refusing to let him testify. (Tr. 334). The ALJ assured plaintiff's attorney that he was not impugning his integrity but, rather he was just requesting relevant evidence. (Tr. 335). Plaintiff next restated that she last physically worked at AT&T in December 2001 and was out on disability until September of 2002, when she was terminated. (Id.). Plaintiff then excused herself from the hearing to vomit. (Tr. 337).

Plaintiff's attorney next indicated that he did not desire the ALJ to keep the record open for submission of additional evidence because it would not make any difference in the outcome of the case. (Id.). The ALJ stated that plaintiff has testified regarding receiving additional treatment and that it may be helpful to review those records. (Tr. 337-38). Plaintiff's attorney then questioned the ALJ's impartiality, after which a discussion was held off the record. (Tr. 338-39). When the hearing resumed, plaintiff's attorney again expressed the opinion that submitting additional medical evidence would not change the outcome of the case. (Tr. 340). The ALJ asked plaintiff's attorney whether he would like a different judge to decide the case. (Id.). Plaintiff's attorney responded that he would not request a different judge because he did not want further delay for his client. (Id.). The ALJ then expressed concern that the record was not complete because the last records from Dr. Baak and from Dr. Ibe contained in the file were from September 2002, and there were no records in the file from Dr. Mai or from plaintiff's emergency room visit to Christian Hospital Northwest. (Tr. 341-42). Plaintiff's attorney stated that he would obtain these additional records. (Tr. 342).

The ALJ then examined the vocational expert, Jeffrey Magrowski, Ph.D, who testified that he had not had any contact with plaintiff prior to the hearing but he had reviewed her file. (Tr.

343). Plaintiff's attorney indicated that he did not have any objections to Dr. Magrowski's qualifications. (Tr. 344). Dr. Magrowski testified that plaintiff had a cashiering job in 1989, which may be beyond the prior 15 years, and that her last job was with AT&T as an account representative. (Id.). Dr. Magrowski stated that these jobs are typically sedentary and skilled. (Id.). Dr. Magrowski testified that plaintiff also worked at a pantry as a clerk, which he described as medium and unskilled. (Id.). Dr. Magrowski stated that plaintiff indicated that she did some roofing work, which he described as heavy to very heavy and unskilled. (Id.).

The ALJ asked Dr. Magrowski to assume a hypothetical worker who is able to lift 20 pounds occasionally and 10 pounds frequently, who could stand or walk up to two hours in an eight-hour workday with normal breaks, and sit up to six hours in a normal workday with regular breaks. (Id.). Dr. Magrowski testified that such an individual could perform plaintiff's past work as an account representative. (Id.).

The ALJ next asked the vocational expert to assume the same factors but add that the worker should have only occasional contact with the public. (Tr. 345). Dr. Magrowski responded that such an individual could not perform plaintiff's past work and that customer service jobs involving public contact would be eliminated. (Id.). The ALJ asked the vocational expert whether such an individual with the same age, education, and work experience as plaintiff could adjust to perform other work. (Id.). Dr. Magrowski responded that such an individual could perform other work, such as "general clerk," and that there is an excess of 4,000 of such positions in the St. Louis area and over 200,000 nationally. (Id.). Dr. Magrowski stated that such an individual could also perform unskilled work such as assembly, fabricating, or packing work. (Id.).

The ALJ next asked the vocational expert to add the additional limitation that the worker should only occasionally grasp or handle with the non-dominant hand. (Tr. 346). Dr. Magrowski testified that the only type of job such an individual could perform would be "security monitor," and that 600 of such positions exist in the state and over 3,000 of such positions exist nationally. (Id.). The ALJ then asked the vocational expert to add the restriction of only occasional grasping or handling with the dominant hand. (Id.). Dr. Magrowski stated that this would not effect his last response. (Id.). The ALJ next asked the vocational expert to add the limitation that the worker could sit for no longer than 30 minutes at one time without having to change positions. (Id.). Dr. Magrowski testified that there would be no jobs for an individual with those restrictions. (Id.).

Plaintiff's attorney then examined the vocational expert, who testified that plaintiff could not work as a clerk if she could walk less than one half of a block without sitting down. (Tr. 347). Dr. Magrowski stated that he was not asked to take into consideration the number of days plaintiff has missed work due to doctor or hospital visits. (Id.). Dr. Magrowski testified that, in his experience, employers would allow a new employee to miss work up to two days a month initially for doctor and hospital visits. (Id.). Dr. Magrowski stated that an employee who consistently missed work for doctor and hospital appointments in excess of two days a month would eventually be terminated. (Id.). Plaintiff's attorney asked the vocational expert whether plaintiff was employable, considering she is facing back surgery and left arm surgery. (Tr. 348). Dr. Magrowski testified that he could not answer that question. (Id.).

Plaintiff's attorney then indicated that he would obtain the records of Dr. Mai, Christian Hospital, and Dr. Ibe within 30 days. (Id.). The ALJ concluded the hearing by stating that he

would keep the record open until September 10, 2004.  (Tr. 349).

## B.    <u>Relevant Medical Records</u>

The record reveals that plaintiff was treated by Faquir Muhammud, M.D. from March 2000 to September 2002.  (Tr. 219-59).  On May 23, 2000, plaintiff tested positive for hepatitis C.  (Tr. 238).  Dr. Muhammud referred plaintiff to Heather White, M.D., for a consultation. (<u>Id.</u>).  On July 11, 2000, Dr. Muhammud prescribed Flexeril (Tr. 237).  On December 14, 2000, Dr. Muhammud noted that plaintiff had a history of fibromyalgia and rheumatoid arthritis.  (Tr. 234).

Plaintiff saw Dr. White on June 22, 2000 for a hepatitis C evaluation.  (Tr. 191).  Dr. White stated that plaintiff had normal liver enzymes and that she would not be a candidate for a liver biopsy, although tests were necessary to determine if she actually had the virus in her blood stream.  (<u>Id.</u>).  Dr. White also found that plaintiff had rectogenital warts and she referred plaintiff to surgeon Morin Hanson, M.D., for excision. (Tr. 191-92).  On August 15, 2000, Dr. White indicated that the hepatitis C virus was found in plaintiff's blood.  (Tr. 194).  Dr. White noted that she would not provide treatment for the hepatitis C because plaintiff's liver enzymes were normal. (<u>Id.</u>).

Plaintiff underwent imaging of the thoracic[23] spine at Christian Hospital on March 25, 2001.  (Tr. 257).  The interpreting physician's impression was degenerative disease of the thoracic

---

[23]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  <u>See</u> J. Stanley McQuade, <u>Medical Information Systems for Lawyers</u>, § 6:27 (1993).

spine.  (Id.).

On December 20, 2001, plaintiff presented to Dr. Muhammud complaining of right heel pain, right hip pain, right leg pain, right shoulder pain, bad headaches, and swelling on the left side of her neck.  (Tr. 224).  Dr. Muhammud's assessment was fibromyalgia, right heel fascitis, and a lump on the left side of the neck.  (Tr. 223).  Dr. Muhammud increased plaintiff's dosage of Flexeril and added Naproxen.[24]  (Id.).  He also referred plaintiff to a rheumatologist for treatment of her fibromyalgia, and referred her to an Ear, Nose and Throat (ENT) specialist for the lump on the left side of her neck.  (Id.).

Plaintiff saw Sheldon L. Davis, M.D., an ENT physician, on December 31, 2001, for evaluation of a possible recurrence of a cyst that was removed when she was 14.  (Tr. 184-85). Plaintiff reported headaches in the top of her head with radiation to the back of her neck.  (Tr. 184).  Dr. Davis did not find anything in the neck area to cause concern or that would require excision.  (Tr. 185).

Plaintiff saw rheumatologist Steven W. Baak on January 22, 2002.  (Tr. 282).  Dr. Baak noted that plaintiff had been referred by Dr. Muhammud with complaints of joint and muscle pains for five years and a history of fibromyalgia.  (Id.).  Dr. Baak also noted that plaintiff had been treated at the Wohl Clinic and was diagnosed with fibromyalgia, rheumatoid arthritis, and hepatitis C, but was unable to continue treatment due to lack of insurance coverage.  (Id.).  Dr. Baak's impression was degenerative joint disease of the lumbosacral spine, depression, irritable

---

[24]Naproxen is a non-steroidal anti-inflammatory drug indicated for the treatment of rheumatoid arthritis.  See PDR at 2874-75.

bowel disease, GERD[25] and incontinence, and hepatitis C. (Id.). In a letter dated January 22,

2002, Dr. Baak stated that plaintiff was "very bound up in her numerous illnesses." (Tr. 282).

Dr. Baak found that plaintiff "seems to have primarily fibromyalgia-type complaints, chronic

depression, and irritable bowel symptoms." (Id.). Dr. Baak indicated that plaintiff's laboratory

testing produced normal results. (Id.). Dr. Baak prescribed Zanaflex[26] and Celexa. (Id.). He

recommended that plaintiff exercise three times a week, and continue to follow-up for her inactive

hepatitis C. (Id.).

In a letter dated February 5, 2002, Dr. Baak noted that plaintiff "seems to be quite a bit

better." (Tr. 283). Dr. Baak stated that plaintiff was taking the Celexa, sleeping better, attending

physical therapy, and doing her exercises. (Id.). Dr. Baak indicated that plaintiff's right plantar

fascia[27] was injected on that day. (Id.). Dr. Baak recommended that plaintiff discontinue the

Flexeril. (Id.). Dr. Baak noted that plaintiff was "much clearer mentally," and that she requested

a return to work slip. (Id.).

Plaintiff was seen by psychologist Dr. Poll at Psych Care Consultants on May 29, 2002.

(Tr. 266-68). Dr. Poll diagnosed plaintiff with panic disorder[28] with agoraphobia and depression

due to chronic pain. (Tr. 268). Dr. Poll rated plaintiff's intelligence level as high average to

superior and found that plaintiff was oriented to self, time, place, and person. (Id.). Dr. Poll

found that plaintiff presented a moderate level of suicide risk and that her insight judgment was

---

[25]Abbreviation for gastroesophageal reflux disease. Stedman's at 740.

[26]Zanaflex is a muscle relaxer indicated for the relief of muscle spasm. See PDR at 2578.

[27]Deep tissue in the sole of the right foot. See Stedman's at 649.

[28]Recurrent panic attacks that occur unpredictably. Stedman's at 527.

questionable.  (Id.).  Plaintiff saw Dr. Ibe at Psych Care Consultants on July 10, 2002.  (Tr. 264).

Dr. Ibe noted that plaintiff had severe depression and anger towards her job due to her employer's

firing her after she had hand surgery.  (Id.).  On July 24, 2002, Dr. Ibe noted that plaintiff was

feeling more relaxed.  (Tr. 262).  Plaintiff reported that she resists sleeping at night for fear of

somebody breaking in.  (Id.).  Plaintiff also indicated that she has difficulty trusting men because

her father was a pedophile.  (Id.).  On August 26, 2002, Dr. Ibe indicated that plaintiff's anxiety

and depression were responding to treatment.  (Tr. 261).

Plaintiff began seeing podiatrist Shari L. Kaminsky upon the referral of Dr. Baak on April

22, 2002.  (Tr. 205).  Plaintiff complained of pain in her right heel, which caused her knee and hip

to hurt.  (Id.).  X-rays revealed no sign of fracture or spur.  (Id.).  Dr. Kaminsky's impression was

plantar fasciitis.  (Id.).  She injected the right heel and dispensed a wrap to help support the arch.

(Id.).  On May 6, 2002, plaintiff indicated that her right heel felt better for a while but then she

began experiencing pain in her ankle.  (Tr. 204).  Dr. Kaminsky's impression was plantar fasciitis

and tarsal tunnel syndrome of the right foot.  (Id.).  Dr. Kaminsky prescribed Motrin[29] and

discussed orthotics with plaintiff.  (Id.).

A nerve conduction study dated June 11, 2002 revealed diminished amplitude of the right

perineal nerve,[30] which could imply underlying neuropathy.[31]  (Tr. 190).  Evidence of tarsal tunnel

---

[29]Motrin contains ibuprofen, which is a nonsteroidal anti-inflammatory drug indicated for the relief of minor pain.  See PDR at 1934-35.

[30]Nerve located in the area between the thighs extending from the coccyx to the pubis and lying below the pelvic diaphragm.  See Stedman's at 1349.

[31]A classical term for any disorder affecting any segment of the nervous system. Stedman's at 1211.

syndrome with involvement of the medial plantar nerve[32] was also found. (Id.).

On July 9, 2002, plaintiff reported continued problems with the right foot and similar symptoms developing with the left foot. (Tr. 203). Dr. Kaminsky noted that plaintiff said her foot pain was caused from a work injury although Dr. Kaminsky had no recollection of telling plaintiff that her condition was caused by an injury sustained at work. (Id.). Dr. Kaminsky's impression was tarsal tunnel syndrome, plantar fasciitis in the right foot, and possible tarsal tunnel syndrome in the left foot. (Id.). Dr. Kaminsky noted that she discussed plaintiff's story with Dr. Baak and that Dr. Baak has no documentation of any injury to the right foot. (Id.). Dr. Kaminsky commented that Dr. Baak stated that plaintiff "has a very problematic case and that he has found it very difficult to take care of her as well." (Id.). On July 18, 2002, plaintiff reported significant pain in her right foot and similar symptoms in her left foot. (Tr. 202). Dr. Kaminsky's impression was bilateral tarsal tunnel syndrome. (Id.). On August 26, 2002, Dr. Kaminsky's impression was plantar fasciitis and tarsal tunnel syndrome with pain in the right foot. (Tr. 201). Dr. Kaminsky administered an injection in the right tarsal tunnel. (Id.). On September 16, 2002, plaintiff reported to Dr. Kaminsky that her orthotics needed to be adjusted and that she was experiencing significant hip and knee pain. (Tr. 200). Dr. Kaminsky's impression was tarsal tunnel syndrome and plantar fasciitis. (Id.). Dr. Kaminsky indicated to plaintiff that she would like to provide conservative care. (Id.).

On August 15, 2002, laboratory testing revealed evidence of mild bilateral carpal tunnel syndrome. (Tr. 186). In a letter dated September 3, 2002, Dr. Baak indicated that a neurologist had found that plaintiff tested positive for carpal tunnel syndrome. (Tr. 280). Dr. Baak expressed

---

[32]Nerve located along the medial aspect of the sole of the foot. See Stedman's at 1198.

the opinion that plaintiff would do better with nocturnal splinting and would not require surgical management. (Id.). On September 18, 2002, Dr. Baak reported that plaintiff was complaining of dyspepsia[33] and a very slow response to tarsal tunnel treatment that she was receiving from Dr. Kaminsky. (Tr. 281). Dr. Baak noted that plaintiff was experiencing symptoms of carpal tunnel syndrome on the right and was referred to Dr. Dan Scodary for evaluation. (Id.).

On September 24, 2002, plaintiff complained of terrible pain in her right foot that was causing hip pain. (Tr. 199). Dr. Kaminsky discussed tarsal tunnel decompression of the right foot with plantar fasciotomy[34] of the right foot in detail with plaintiff and scheduled surgery. (Id.). Plaintiff underwent surgery on September 27, 2002. (Tr. 214-16). Dr. Kaminsky stated that plaintiff could not bear weight for one month with a gradual increase in weight bearing over the next one month. (Tr. 206). Dr. Kaminsky expressed the opinion that plaintiff could sit continuously for eight hours but could not stand or walk, and that plaintiff could lift up to ten pounds occasionally. (Id.). Dr. Kaminsky further found that plaintiff could work a total of 40 hours a week. (Id.). Plaintiff was considered disabled from working from September 23, 2002 to October 25, 2002. (Id.).

Plaintiff saw Dr. Kaminsky for follow-up after surgery on October 14, 2002. (Tr. 198). Dr. Kaminsky removed plaintiff's cast and sutures and noted that the wounds looked very good. (Id.). Dr. Kaminsky's impression was "status post decompression of the right tarsal tunnel, right plantar fasciotomy." (Id.). Dr. Kaminsky dispensed a walker to plaintiff. (Id.). Plaintiff reported

---

[33]Impaired gastric function or "upset stomach" due to some disorder oft eh stomach. Stedman's at 554.

[34]Incision through the deep tissue in the sole of the foot. See Stedman's at 653.

that she had been fired for missing work prior to her surgery and that her disability insurance found that she had a sedentary job and should be able to return to work. (Id.).

R. Rocco Cottone, Ph.D. completed a psychiatric review technique form on November 27, 2002. (Tr. 80-93). Dr. Cottone found that plaintiff had a non-severe impairment co-existing with her pain. (Id.). Dr. Cottone assessed that plaintiff had depression secondary to pain and panic disorder with agoraphobia, although neither impairment precisely satisfied diagnostic criteria. (Tr. 83, 85). Dr. Cottone expressed the opinion that plaintiff's impairments imposed only mild limitations on plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, and pace. (Tr. 90). Dr. Cottone commented that plaintiff's activities of daily living do not reflect serious restriction due to anxiety or agoraphobia. (Tr. 92). He pointed out that plaintiff "shops, she drives a car, picks up her daughter from school, [and] goes to doctors." (Id.). Dr. Cottone concluded that plaintiff's mental impairments were not severe. (Id.).

On December 20, 2002, W. Bruce Donnelly, M.D., a non-examining state physician stated that plaintiff's impairment was severe at the time, due to recent foot surgery and the use of a walker. (Tr. 79). Dr. Donnelly noted that the EMG revealed evidence of "mild" tarsal tunnel disease. (Id.). He stated that by April 1, 2003, the impairment should be non-severe. (Id.). Dr. Donnelly expressed the opinion that plaintiff's allegations were "only partially credible." (Id.).

Plaintiff presented to Charles D. Ettelson, M.D., F.C.C.S. on September 11, 2003, complaining of numbness and tingling in the right hand. (Tr. 128). Plaintiff indicated that she also experienced numbness in the left hand, but the right hand was worse. (Id.). Dr. Ettelson found that plaintiff's history was suggestive of carpal tunnel syndrome but the physical

examination was "not very strong." (Id.).  Dr. Ettelson recommended nerve conduction tests of both the median[35] and ulnar[36] nerves.  (Id.).  Nerve conduction studies revealed mild to moderate right carpal tunnel syndrome and mild left carpal tunnel syndrome, and a mild slowing of the left ulnar nerve across the elbow.  (Tr. 132).  It was noted on the nerve conduction study report that plaintiff had a two-year history of numbness, tingling, pain, and weakness in the hands and arms.  (Id.).

Plaintiff presented to Dr. Eric Mai on October 1, 2003, complaining of back pain.  (Tr. 157).  Dr. Mai noted that plaintiff had been referred to SLUCare Neurology, where findings of bilateral carpal tunnel were noted.  (Id.).  Dr. Mai stated that plaintiff's pain increased with movement and with remaining in the same position.  (Id.).  Dr. Mai's assessment was lower back pain.  (Id.).  Dr. Mai recommended that plaintiff continue taking Vicodin and Flexeril.  (Id.).  Plaintiff complained of back pain again on December 15, 2003.  (Tr. 154).

Plaintiff saw Dr. Ettelson on October 23, 2003, to discuss the results of her nerve conduction study and the results of a trial of splinting and anti-inflammatories.  (Tr. 125).  Plaintiff reported that her symptoms had not improved from using the splint at night and taking ibuprofen.  (Id.).  Dr. Ettelson recommended release of the right carpal tunnel.  (Id.).  He stated that if plaintiff experiences significant relief after the carpal tunnel release of the right hand, then he would be inclined to operate on the left hand as well.  (Id.).  Dr. Ettelson scheduled the right carpal tunnel release.  (Id.).  Dr. Ettelson performed a decompression of the right median nerve at

---

[35]The median nerve passes through the carpal tunnel and supplies the muscles in the anterior compartment of the forearm.  See Stedman's at 1198.

[36]Nerve that passes down the forearm to the hand.  See Stedman's at 1202.

carpal tunnel on October 31, 2003. (Tr. 123). On November 19, 2003, plaintiff saw Dr. Ettelson for suture removal and wound inspection following the right carpal tunnel release surgery. (Tr. 122). Dr. Ettelson advised plaintiff to do light everyday activity and range of motion exercises. (Id.).

On February 9, 2004, plaintiff underwent an x-ray of the lumbar spine, which revealed lumbar spondylosis,[37] and grade 1 degenerative spondylolisthesis[38] at L4-5. (Tr. 173). The examiner indicated that, if plaintiff has persistent symptoms, an MRI scan may be necessary to assess for nerve root impingement or coexisting disk herniation. (Id.). Plaintiff underwent an MRI of the lumbosacral spine on February 19, 2004, which revealed disc bulging, facet hypertrophy,[39] and ligamentum flavum hypertrophy[40] at L4-5, with a moderate probability of significant encroachment. (Tr. 171).

Plaintiff presented to the emergency room at Christian Hospital on February 23, 2004, for treatment of an injury to the right foot. (Tr. 159). The impression was a fracture of the right fifth toe. (Tr. 160). Ibuprofen and Ultram[41] were prescribed. (Id.). Plaintiff's medications were listed as Celexa, Buspar, Flexeril, and Pepcid AC. (Tr. 161).

---

[37]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. See Stedman's at 1678.

[38]Forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum. Stedman's at 1678.

[39]Increase in the size of the facet. See Stedman's at 857.

[40]Increase in the size of the flava, which are ligaments that bind together the plates of adjoining vertebrae. See Stedman's at 1007.

[41]Ultram is a centrally acting analgesic indicated for the management of moderate to moderately severe pain. See PDR at 2552-53.

Plaintiff saw Dr. Mai on March 4, 2004, at which time she complained of lower back pain with radiation to the right knee. (Tr. 149). Dr. Mai's assessment was lower back pain. (Id.). Dr. Mai recommended that plaintiff utilize non-steroidal anti-inflammatory drugs (NSAID) and Vicodin. (Id.). On March 18, 2004, Dr. Alan Gocio prescribed Lorcet.[42] (Tr. 144). On May 24, 2004, Dr. Mai noted that an epidural steroid injection was administered, plaintiff had seen a pain specialist, and plaintiff was taking three Percocets[43] a day. (Tr. 140). Dr. Mai's assessment was sciatica,[44] rheumatoid arthritis, and right tenosynovitis.[45] (Id.). On June 21, 2004, plaintiff saw Dr. Mai and requested to continue with the pain medications. (Tr. 137). Plaintiff reported that the pain was continuous with the Percocet. (Id.). Dr. Mai indicated that plaintiff had lower back pain with radiation. (Id.). Dr. Mai's assessment was lower back pain with sciatica and rheumatoid arthritis. (Id.). Dr. Mai prescribed MS Contin.[46] (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since at least March 20, 2002.

---

[42]Lorcet is a combination of acetaminophen and hydrocodone indicated for the relief of moderate to moderately severe pain. See PDR at 3240.

[43]Percocet is a combination of oxycodone and acetaminophen indicated for the relief of moderate to moderately severe pain. See PDR at 1222-23.

[44]Pain in the lower back and hip radiating down the back of the thigh into the leg initially attributed to sciatic nerve dysfunction, but now known to usually be due to herniated lumbar disk compromising a nerve root. Stedman's at 1602.

[45]Inflammation of a tendon and its enveloping sheath. Stedman's at 1795.

[46]MS Contin is a controlled-release oral morphine formulation indicated for the relief of moderate to severe pain for patients "who require repeated dosing with potent opioid analgesics over periods of more than a few days." PDR at 2807.

2.      The medical evidence establishes that the claimant has post carpal tunnel release, status-post tarsal tunnel decompression, degenerative disc disease and depression, but that she does not have an impairment or combination of impairments listed in, or medically equal to, the appropriate listings set forth in Appendix 1, Subpart P, Regulations No. 4.

3.      The allegations of symptoms, or combination of symptoms, of such severity as to preclude all types of work activity are not consistent with the evidence as a whole and are not persuasive.

4.      The claimant's impairments preclude: lifting more than twenty pounds occasionally and ten pounds frequently; standing and walking more than two hours in an eight hour work day; sitting more than six hours in an eight hour work day; contact with the public more than occasionally; and more than occasionally gripping and handling objects.

5.      The claimant cannot perform her past relevant work.

6.      The claimant is forty years old and has two years of college education.

7.      In view of the claimant's age and residual functional capacity, the issue of transferability of work skills is not material.

8.      The claimant can perform other work existing in significant numbers. This finding is based upon the credible testimony of the vocational expert.

9.      The claimant has been able to perform other work, existing in significant numbers, since March 20, 2002. The claimant has been able to perform substantial gainful activity since March 20, 2002. The claimant was not under a disability, as defined under the Social Security Act, at any time through the date of this decision.

(Tr. 14-15).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on October 10, 2002, the claimant is not eligible for Supplemental Security Income Benefits, under section 1614(A)(3)(A) the Social Security Act.

(Tr. 15).

**Discussion**

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  It is not the court's task "to review the evidence and make an independent decision."  See Mapes, 82 F.3d at 262.  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See id.  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

- 28 -

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must

indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff raises three claims on appeal of the decision of the Commissioner. Plaintiff argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations. Plaintiff also argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff finally argues that the ALJ posed an improper hypothetical to the vocational expert.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain

and limitation not credible. Plaintiff specifically argues that the ALJ failed to properly apply the standards required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The undersigned agrees.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski, 739 F.2d at1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is not supported by substantial evidence in the record as a whole. In discrediting plaintiff's credibility, the ALJ failed to address some relevant Polaski factors. Moreover, the credibility factors indicated by the ALJ are either not dispositive in themselves or appear to be analyzed incorrectly. For instance, the ALJ first indicates that the objective medical findings do not lend credibility to plaintiff's complaints of pain. While this is a

factor upon which the ALJ may rely, it may not be solely relied upon by an ALJ to discredit a plaintiff's subjective complaints. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ first states that "there is no medical evidence that the claimant was prescribed, or determined to require, the prolonged use of an assistive device such as a cane or brace for the purpose of ambulation, motion or immobilization, for twelve consecutive months, since the alleged onset date." (Tr. 13). Although it is true that no assistive devices were prescribed, it is not necessary that such devices be prescribed in order to find a claimant disabled. The ALJ also pointed out that plaintiff did not seek treatment through physical therapy or a work hardening program, and the fact that medical records do not document the presence of significant atrophy or loss of muscle tone. (Id.). Again, although these may be relevant factors in assessing the medical record, such findings are not required for a finding of disability. The fact that plaintiff did not attend physical therapy or a work hardening program and the absence of medical findings of significant atrophy or loss of muscle tone are not sufficient reasons to discredit plaintiff's subjective complaints. There was evidence that she had seen a pain specialist. (Tr. 140).

The ALJ next discussed plaintiff's daily activities. The ALJ states that, "[t]he claimant has reported that she is able to do up to six consecutive hours of housework before taking a break." (Id.). He also pointed out that plaintiff is able to read, watch televison, and assist her daughter with homework. The ALJ then found that "the claimant's ability to do housework for six hours straight, read, watch televison and help her daughter with school work are inconsistent with allegations of inability to maintain sustained concentration and perform at least some exertional tasks." (Id.). The undersigned agrees that performing six consecutive hours of housework

detracts considerably from the credibility of a claimant's subjective complaints. Plaintiff, however, did not testify that she could perform six consecutive hours of housework.

When plaintiff's attorney asked plaintiff whether she was able to do "housework or other things as much as six hours straight without laying down and resting," plaintiff responded, "[n]o." (Tr. 298). Plaintiff testified that she limits the amount of housework she does and that her daughter helps her with the housework. (Id.). Plaintiff testified that she *watches televison* for six hours a day. (Tr. 311). The ALJ's statement that plaintiff performs housework for six consecutive hours is simply incorrect. Further, the ALJ appeared to accord significant weight to this incorrect finding.

The only other daily activities of plaintiff that the ALJ pointed to were reading, watching televison, and helping her daughter with school work. Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). However, the Eighth Circuit has repeatedly held that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." Burress v. Apfel, 141 F.3d 875, 881 (8th Cir. 1998) (quoting Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996)); see also Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000) ("The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work"); Ekeland v. Bowen, 899 F.2d 719, 723 (8th Cir. 1990) ("[A] claimant's ability to perform household chores does not necessarily prove that claimant capable of full-time employment"). Plaintiff's daily activities of reading, watching televison, and helping her daughter with school work are not indicative of plaintiff's ability to sustain full-time work, nor are they inconsistent with plaintiff's complaints of pain and

limitations.  For these reasons, the ALJ's reliance on these activities in discrediting plaintiff's complaints was erroneous.

Also erroneous is the ALJ's treatment of the dosage, effectiveness and side effects of plaintiff's medication.  At the time of the hearing, plaintiff was taking the powerful pain reliever Oxycontin twice daily, along with Flexeril, after Vicodin and Morphine provided no relief.  The fact that plaintiff's physicians prescribed powerful pain relievers reveals that they believed plaintiff was experiencing significant pain.  Plaintiff's medications also included psychotropic medications such as Celexa and BuSpar.  In addition, plaintiff was taking Combivent, Immotadine, and Pepcid AC.  The ALJ does not discuss these medications or their dosages, other than mentioning that plaintiff testified that she was taking the medications.  Moreover, plaintiff testified numerous times that this medication did not relieve her pain.  In spite of these allegations, the ALJ fails to discuss the effectiveness of plaintiff's medications.  Further, the ALJ did not discuss the side effects of these medications, despite plaintiff's testimony that she experienced side effects, including dizziness and dry mouth.  (Tr. 304).  For these reasons, the ALJ's discussion of the dosage, effectiveness, and side effects of plaintiff's numerous medications is not complete.

In conclusion, the ALJ failed to cite to the relevant factors and give good reasons for discrediting plaintiff's complaints.  Further, some of the alleged "inconsistencies" pointed to by the ALJ in his opinion rely on incorrect facts.  For these reasons, the ALJ's credibility analysis is lacking.  Credibility of plaintiff's complaints was of paramount importance in the disability determination, as vocational expert Dr. Magrowski himself testified that if plaintiff's complaints were entirely credible, then she would not be able to perform any of the jobs he pointed out, nor would such an individual be able to perform any job at all. (Tr. 346).  Accordingly, the

undersigned recommends that the decision of the Commissioner be reversed this cause be remanded to for a more thorough and accurate evaluation of plaintiff's subjective complaints of pain and limitations.

**2.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred by assessing a residual functional capacity that was not based on the medical evidence of record and did not comply with the standards contained in Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), and Lauer v. Apfel, 254 F.3d 700 (8th Cir. 2001). Defendant argues that the ALJ properly determined plaintiff's residual functional capacity.

Assessment of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer, 245 F.3d at 704. Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

In the instant case, the undersigned finds that the ALJ's assessment of residual functional capacity is not supported by substantial evidence. In his opinion, the ALJ noted that his residual functional capacity assessment was "consistent with the notes of [plaintiff's] treating physicians

- 36 -

and their lack of any long term physical restrictions on her ability to work and the opinion of the

state agency psychiatrist with respect to her mental capacity to perform work." (Tr. 13). The ALJ

formulated the following residual functional capacity for plaintiff:

> [T]he undersigned finds that the record establishes that the claimant's impairments
> preclude, at most: lifting more than twenty pounds occasionally and ten pounds frequently;
> standing and walking more than two hours in an eight hour work day; sitting more than six
> hours in an eight hour work day; contact with the public more than occasionally; and more
> than occasionally gripping and handling objects.

(Id.). None of plaintiff's treating physicians, however, has offered an opinion regarding plaintiff's

functional limitations or capacities.

While the ALJ states that his residual functional capacity is based on the "notes of

[plaintiff's] treating physicians," there is no medical evidence that addresses plaintiff's ability to

function in the workplace which is supportive of the ALJ's determination. The ALJ possibly

based his residual functional capacity assessment in large part on plaintiff's alleged lack of

credibility. As previously discussed, however, the undersigned has found that the ALJ's

credibility analysis was deficient. Thus, the ALJ's residual functional capacity is not supported by

substantial evidence in the record as a whole. Accordingly, the undersigned recommends that the

decision of the Commissioner be reversed and this cause remanded in order for more accurate

residual functional capacity to be assessed based on medical evidence addressing plaintiff's ability

to function in the workplace.

## 3.   **Vocational Expert Testimony**

Plaintiff finally claims that the hypothetical posed to the vocational expert was deficient.

The undersigned has found that the ALJ failed to properly analyze plaintiff's subjective

complaints, which led to an inaccurate residual functional capacity. The hypothetical that the ALJ

posed to the vocation expert was based upon this residual functional capacity. Accordingly, the undersigned recommends that the decision of the Commissioner be reversed and this cause remanded in order for the ALJ to pose a new hypothetical based upon a proper residual functional capacity.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 605 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this ___24th___ day of January, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE